UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
JASPER DIVISION


UNITED STATES OF AMERICA,          6:20-mj-00350-GMB

                Plaintiff,         October 27, 2020

VS.                                Birmingham, Alabama

DEIVIN ESCALANTE,                  3:45 p.m.

                Defendant.


UNITED STATES OF AMERICA,          6:20-mj-00349-GMB

                Plaintiff,         October 27, 2020

VS.                                Birmingham, Alabama

CRYSTAL ESCALANTE,                 3:45 p.m.

                Defendant.
* * * * * * * * * * * * * * * * * * * * * * * * *


REPORTER'S OFFICIAL TRANSCRIPT OF
BOND HEARING


BEFORE THE HONORABLE GRAY M. BORDEN
UNITED STATES DISTRICT MAGISTRATE JUDGE






COURT REPORTER:
Teresa Roberson, RMR
Federal Official Court Reporter
1729 Fifth Avenue North, Suite 200
Birmingham, Alabama  35203

```
1                     * * * * *
                A P P E A R A N C E S
2                     * * * * *

3   FOR THE GOVERNMENT:

4   Russell Penfield
    U.S. Attorney's Office
5   1801 4th Avenue North
    Birmingham, Alabama  35203
6   205.244.2001

7   FOR THE DEFENDANT DEIVIN ESCALANTE:

8   Gregory Reid
    P.O. Box 245
9   Hayden, Alabama  35079

10  FOR THE DEFENDANT CRYSTAL ESCALANTE:

11  Ellis Bingham
    Bingham at Law
12  218 16th Street North
    Bessemer, Alabama  35020
13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    I N D E X

 2   WITNESS RICHARD ROGERS

 3   DIRECT BY MR. PENFIELD.....................8
     CROSS BY MR. BINGHAM.......................13
 4   CROSS BY MR. REID..........................33

 5

 6   WITNESS HUBERT HOLT

 7   DIRECT BY MR. REID.........................51
     CROSS BY MR. BINGHAM.......................55
 8

 9   WITNESS ROYCE BENEFIELD

10   DIRECT BY MR. REID.........................57
     CROSS BY MR. BINGHAM.......................59
11

12   WITNESS ROBERT ISON

13   DIRECT BY MR. REID.........................60
     CROSS BY MR. BINGHAM.......................62
14   CROSS BY MR. PENFIELD......................63
     REDIRECT BY MR. REID.......................64
15

16   WITNESS ANDREW ESCALANTE

17   DIRECT BY MR. REID.........................65
     CROSS BY MR. BINGHAM.......................66
18

19

20

21

22

23

24

25
```

```
                        * * * * *
                 P R O C E E D I N G S
                        * * * * *
```

1

2

3       THE COURT:  We're on the record in 20-MJ-349 which

4  is United States versus Crystal Escalante, and 20-MJ-350,

5  United States versus Deivin Escalante.

6          One issue I want to take up, as we're getting

7  started, it appears that the question of joint

8  representation has been resolved.  And Mr. Reid has now

9  appeared for Mr. Escalante and Mr. Bingham remains counsel

10  of record for Mrs. Escalante.

11          Is there any reason not to grant them,

12  Mr. Bingham's motion to withdraw in 20-MJ-350 or the Federal

13  Defender's motion to withdraw in 20-MJ-349?

14          MR. PENFIELD:  No, Your Honor.

15          MR. REID:  No, Your Honor.

16          THE COURT:  Both of those motions then are

17  granted.  And we will be able to move forward then today.

18          We set this time for both a preliminary and

19  detention hearings in both cases; technically they are two

20  cases, although I'm sure the government intends to combine

21  these into one indictment if this case makes it past the

22  preliminary hearing.

23          But I understand there may be an agreement on

24  detention as to at least one of the defendants; is that

25  accurate?

1    MR. PENFIELD:  Your Honor, the government's
2    reviewed the pretrial services report with regard to
3    Mrs. Escalante.  I think the conditions are reasonable.  I
4    think what we had a bit of a struggle on this afternoon is
5    there should be surety, I think it should be at least one
6    hundred thousand dollars.  The other conditions the
7    government is satisfied with.

8          Mrs. Escalante and her counsel providing property
9    would satisfy the Court and the probation office.  We have
10   seized a good number of assets from the Escalantes.  So I
11   think the issue becomes what property is being put up which
12   is not payment, i.e., would give her concern about fleeing.
13   I think counsel has been discussing that with the family.  I
14   don't know what that piece of property ultimately will be.
15   I think they are going to have to provide that piece of
16   property.

17         But in terms of the conditions, I think she's
18   probably a candidate for a secured bond and we would ask for
19   one hundred thousand dollars and whatever property they put
20   up.

21         THE COURT:  Mr. Bingham, what's your perspective
22   on that?

23         MR. BINGHAM:  Your Honor, our perspective is,
24   we're not opposed to conditions.  As to the amount, we're
25   not in vociferous disagreement with a hundred thousand

1  dollars secured because she has two sister-in-laws that can

2  put up that.

3          However, having said that, we would like the Court

4  to hear the evidence presented at the preliminary hearing

5  and the law thereon and Your Honor may be persuaded to lower

6  that somewhat.

7          THE COURT:  I think that's an appropriate process

8  to use.  We'll hear the preliminary hearing.  And I intend

9  to hear the evidence relating to both the preliminary and

10 detention hearings simultaneously; that's my typical

11 practice.

12          But I'll say this, you're both welcome to present

13 any evidence you would like relating to Mrs. Escalante and

14 specifically to her amenability to release or to anything

15 relating to what would motivate her not to flee, I suppose,

16 and we'll just have to decide at the end what the

17 appropriate amount of surety is.  Or, whether it's even

18 appropriate for her to be released.

19          I understand that both of you at this point are in

20 agreement that there are conditions that could be fashioned

21 here.

22          With that introduction, I'm ready to hear the

23 government's witnesses.

24          MR. PENFIELD:  Your Honor, I think the way that I

25 would like to proceed, if it pleases the Court, and I have

1  spoken to defense counsel about this.  And I will call -- I

2  will call Agent Rogers to the stand.

3        But my intention, Your Honor, because I know the

4  Court has read it, probably multiple times, is to introduce

5  the affidavit, to swear the agent in, that I believe his

6  testimony will be that it was true last Wednesday when he

7  swore to it, and that it is still true today.  And those

8  essentially are the facts that we'll be presenting, as

9  what's already been submitted into the record in the

10  affidavit which is sworn to.  But I will call Mr. Rogers to

11  swear to it again, if that's all right with the Court.

12        THE COURT:  Let me ask first, then, is there any

13  objection to that procedure by Mrs. Escalante?

14        MR. BINGHAM:  No, Your Honor.

15        THE COURT:  Is there any objection by

16  Mr. Escalante?

17        MR. REID:  No, Your Honor.  As long as I'm clear,

18  we're going to, I guess it's already in the record, but

19  he'll be testifying to what's in his affidavit, and that's

20  all; is that my understanding?

21        MR. PENFIELD:  That's my intention.

22        THE COURT:  Let's make sure everybody is clear.

23  You intend to put him on the stand merely to swear to the

24  truth of the affidavit, that the defendants are now agreeing

25  that they are comfortable with that procedure, certainly

1    they'll have the opportunity to cross-examine the witness.

2         MR. PENFIELD:  Exactly, Judge.  I think that's

3    probably the fastest way to proceed.  And while he's on the

4    stand, I may ask him some questions which may touch on

5    detention, but I can wait on that if the Court wants me to.

6    I will do this first part and see if that --

7         THE COURT:  My preference would be to hear it all

8    at the same time.

9         MR. PENFIELD:  Yes, sir.

10                    RICHARD ROGERS, SWORN

11         THE CLERK:  State your name for the record.

12         THE WITNESS:  My name is Richard E. Rogers.

13                    DIRECT EXAMINATION

14   BY MR. RUSSELL:

15   **Q**    And how are you employed, sir?

16   **A**    I'm a Special Agent with Homeland Security

17   Investigations, a division of Immigration and Customs

18   Enforcement.

19   **Q**    Were you the affiant on the affidavit which led to

20   the complaints against both Mr. and Mrs. Escalante?

21   **A**    Yes, sir.

22   **Q**    And you swore to those, I believe, last Wednesday?

23   **A**    Yes, sir.

24   **Q**    And were the things you swore to at that point, were

25   they true?

1    **A**      Yes, sir.

2    **Q**      Have you had a chance to review the affidavit again?

3    **A**      I have.

4    **Q**      Do you still believe it is true?

5    **A**      Yes, sir.

6    **Q**      Do you swear to its truthfulness?

7    **A**      Yes, sir, I do.

8            MR. PENFIELD:  Your Honor, we would just -- I

9    believe it's already part of the record, but that would be

10   the Government's Exhibit for the detention hearing.

11           THE COURT:  That's accepted as an exhibit;

12   although we will use the copy that's already in the record.

13   **Q**      (By Mr. Penfield)  Agent Rogers, briefly while you're

14   on the stand, because I know there's going to be questions

15   and they're probably going to ask you questions about things

16   that may be in your affidavit.  Do you have a copy of it?

17   **A**      Yes, sir, I do.

18   **Q**      Just a couple of questions that go more towards the

19   detention area and appropriate security.

20           Have you also had a chance to look at the pretrial

21   services report?

22   **A**      Yes, sir, I have.

23   **Q**      Let's just talk about Mrs. Escalante.  Did you see

24   anything in her reporting of her finances which was

25   inconsistent with your investigation as far as you could

1  tell?  I know you just had an opportunity to look at it

2  today.

3  **A**     Yes, sir, I did.

4  **Q**     Can you tell the Court about that?

5  **A**     All of it.

6  **Q**     You can refer to the pretrial services report, that's

7  fine.

8  **A**     So, my understanding of the pretrial report, there's

9  quite a bit less in their -- in the report than they have

10  had in the bank.

11          Also, the amount that -- the weekly amount that

12  they make is a smaller amount in the report than what I have

13  reviewed from their bank accounts.

14  **Q**     Okay.  Let me ask you specifically, you have seized a

15  number -- in the course of this investigation, you reviewed

16  their bank accounts and in fact there has been some civil

17  seizure of their bank accounts.  Approximately how much

18  money, approximately, based on what you were able to seize

19  last week, did Mrs. Escalante and the Grand Family

20  Enterprises have in those accounts, approximately?

21  **A**     We seized a total of five accounts that had

22  approximately four hundred eighty thousand in it, in the

23  five.

24  **Q**     Okay.  And did you seize any vehicles?

25  **A**     Yes, sir.

1  **Q**    And in whose names were those vehicles?

2  **A**    Crystal and Deivin or Crystal or Deivin Escalante.

3  **Q**    Approximately, what was the value of the vehicles

4  that you seized?

5  **A**    Safe estimate would be around five hundred thousand.

6  **Q**    Did you become aware, since Mrs. Escalante's arrest,

7  of whether or not there were any assets that were sought to

8  be transferred from Grand Family Enterprise account into her

9  personal savings account?

10  **A**    Yes, sir, that's correct.

11  **Q**    What was that?

12  **A**    She attempted to transfer one hundred forty-one

13  thousand dollars from their business account to her savings

14  account.

15  **Q**    Okay.  Did you learn anything -- I know this may not

16  be contained in the affidavit, but I believe we discussed

17  it.  Have you learned anything about their travel to or from

18  Guatemala?

19  **A**    I knew of one trip in 2019, December of 2019.  I have

20  since -- I understand that maybe there was two to four trips

21  in 2019.

22  **Q**    Are you aware or have you become aware of whether or

23  not there may be an additional bank account which might be

24  relevant to the Court's consideration today that is in fact

25  in Guatemala?

1    **A**    I discovered a bank card for a bank in Guatemala

2    today.

3    **Q**    And whose name was that in?

4    **A**    Deivin Escalante.

5    **Q**    And Mr. Escalante's status is a legal permanent

6    resident; correct?

7    **A**    That's correct.

8    **Q**    And did you, in fact, see his passport today?

9    **A**    I did see his passport today.

10    **Q**    And what nationality is his passport?

11    **A**    Guatemala.

12    **Q**    And I know you've reviewed the pretrial services

13    report, and you're an HS investigator, Mr. Escalante has

14    apparently been in the United States for some significant

15    period of time; correct?

16    **A**    I understand that to be true, yes.

17    **Q**    And he is married to a United States citizen?

18    **A**    That's correct.

19    **Q**    Are you aware of him ever trying to adjust his status

20    to become a naturalized United States citizen?

21    **A**    No, I'm not aware of that.

22    **Q**    So he is still a legal permanent resident?

23    **A**    That is correct.

24    **Q**    He is married to a United States citizen?

25    **A**    Yes, sir.

1  **Q**    Who could have sponsored him or made efforts to

2  sponsor him to adjust his status?

3  **A**    Yeah, to adjust to a permanent resident; that's

4  correct.

5  **Q**    Right.  Or to adjust to a United States citizen?

6  **A**    Well, there's actually a time limit that he has to

7  wait to become -- to be able to apply to be a naturalized

8  citizen.

9  **Q**    And I'm putting you a bit on the spot, but you're the

10  HSI investigator, has he ever made that effort to your

11  knowledge?

12  **A**    Not to my knowledge, no.

13       MR. PENFIELD:  Your Honor, that's all I have.

14  Thank you.

15       THE COURT:  Is there an agreement as to which

16  defense attorney will cross-examine first?

17       MR. BINGHAM:  That was the agreement, Your Honor.

18       THE COURT:  Just then?

19       MR. BINGHAM:  That was the agreement.

20                 CROSS-EXAMINATION

21  BY MR. BINGHAM:

22  **Q**    Good afternoon, Agent Rogers.

23  **A**    Good afternoon, sir.

24  **Q**    Let me just begin this cross-examination with some of

25  the questions asked to you by the counsel for the

1    government.

2         In that vein, I believe you testified that there

3    was less in the probation report than in your examination of

4    the financial records; is that correct?

5    **A**    Yes, sir, that's correct.

6    **Q**    In your affidavit, I believe you also testified that

7    they openly ran a business called GFE, Grand Family

8    Enterprises.

9    **A**    They do run a business called Grand Family

10   Enterprises; yes, sir.

11   **Q**    That's registered with the State?

12   **A**    Yes, sir, it is.

13   **Q**    Did it appear to you there was any attempt to hide or

14   obfuscated the fact that they were registered with the

15   State?

16   **A**    No, sir.

17   **Q**    And I know that you're not stating that it's illegal

18   to make money if you run a business; correct?

19   **A**    No, sir, it's not.

20   **Q**    So, a well-funded business, in this case employment,

21   may make a hundred thousand dollars, may make a million

22   dollars a year, do you have any assessment to that?  Do you

23   know what day labor business makes typically?  Have you

24   investigated that?

25   **A**    How much a day labor business makes?  No, sir.  I

1  know what theirs makes.  I don't know what somebody else's

2  makes.

3  **Q**     And I appreciate that.  So, you wouldn't know if the

4  money they had, for example, if you're talking about a

5  transfer from the business to the savings account of a

6  hundred forty-one thousand dollars was out of line for a

7  business that made a lot of money?

8  **A**     No, sir, I wouldn't know that.

9  **Q**     And the fact that there was less money in the

10  probation report than bank records revealed could be due to

11  lots of inconsistencies that are not illegal?

12  **A**     Are you asking me if the money in their account was

13  illegal or legal?  I'm not sure what you're asking me.

14  **Q**     No.  If the fact that there was more money in the

15  bank accounts that you examined than was gathered through an

16  oral interview with somebody for purposes of a probation

17  report, that doesn't necessarily speak to anything illegal,

18  does it?

19          MR. PENFIELD:  Objection, Judge, argument.

20          THE COURT:  The objection is argumentative?

21          MR. PENFIELD:  Yes, sir.

22          THE COURT:  Overruled.

23  **A**     Maybe, maybe I -- I wasn't talking about what they

24  have in their bank account.  I was talking about how much

25  money they make per week or month is basically what I was

1    talking about.

2    **Q**      (By Mr. Bingham)  Okay.  Fair enough.  And it's not

3    illegal to travel to Guatemala for Deivin or for my client

4    Crystal, if you're originally from Guatemala, do you see

5    anything surreptitious about that on its face?

6    **A**      It's not illegal for them to travel to Guatemala, no.

7    **Q**      The bank card that you stated that -- I'll strike

8    that question and ask the Court to strike it because it

9    really refers to Mr. Escalante.

10           Let's talk about the affidavit for a few moments.

11   **A**      Okay.

12   **Q**      And I'll go in page order.  I'll let you know what

13   page I'm on.

14   **A**      Yes, sir.

15   **Q**      Y'all made a point that you were told about GFE,

16   that's the LLC that was formed by Deivin and Crystal, and

17   that that LLC, from knowledge you obtained from Mar-Jac

18   Poultry, was engaged in the unauthorized employment of

19   people who were undocumented; correct?

20   **A**      Yes, sir.

21   **Q**      And that led to HSI's investigation?

22   **A**      Yes, sir.

23   **Q**      Do you recall on or about what date that conversation

24   or your information was with regard to Mar-Jac took place?

25   Ball park figure.

1  **A**      2018.

2  **Q**      And did you have any indication from Mar-Jac on how

3  long that practice had been taking place?

4  **A**      No, sir.

5  **Q**      Did you receive any indication as to whether Mar-Jac,

6  which is a fairly large company, was also hiring people

7  through their own HR department?

8  **A**      Okay.  I'm -- explain to me --

9  **Q**      We've got Mar-Jac, this big poultry outfit --

10  **A**      Yes, sir.

11  **Q**      -- and you testified in the affidavit that there was

12  a contract between Mar-Jac and Grand Family Enterprises who

13  were formed by the two defendants --

14  **A**      Correct.

15  **Q**      -- did you receive any information as to whether

16  Mar-Jac had their own HR department which engaged in hiring

17  separate from that contract?

18  **A**      Yes, they have their own employees; yes, sir.

19  **Q**      That's my question.

20  **A**      Okay.

21  **Q**      Now, part of this contract -- let me back up a

22  second.

23          Do you know who proposed the contract to whom?

24  **A**      No, sir, I do not.

25  **Q**      Do you know when the contract took effect?

1    **A**      It might be in here actually.

2    **Q**      It's not in the affidavit, I can tell you that.  Do

3    you have a copy of the contract?

4    **A**      I do have copies of the contract, at my office I do.

5    **Q**      Can you venture a ball park the earliest contract

6    date?

7    **A**      The earliest one that I have is one for 2018 and one

8    for 2019.

9    **Q**      Okay.  So to your knowledge today there's no earlier

10   contract than 2018?

11   **A**      I do not have copies of any contracts earlier than

12   2018.  I did not request any copies earlier than 2018.

13   **Q**      Okay.

14   **A**      So I don't know if there's -- for a fact, I do not

15   know if there's a contract before 2018.

16   **Q**      Fair enough.  No trick questions here.  Okay?

17   **A**      Yes, sir.

18   **Q**      And as part of that contract -- don't you think it's

19   unusual for somebody that is going to be engaged in a

20   surreptitious activity, in your experience as an

21   investigator, somebody who is going to be engaged in what we

22   would consider to be a surreptitious activity to sign a

23   contract?

24   **A**      I don't know that I can answer that.  I mean --

25   **Q**      If you can't, you can't.  That's fine.

1        But don't you think it would also be a little
2  surprising as part of that contract somebody would agree
3  to -- with respect to the employment of undocumented aliens,
4  that somebody would -- as part of the consideration, agree
5  to E-Verify its employees?  Now, I'm talking about Grand
6  Family Enterprises.

7  **A**      Yes, sir.

8  **Q**      And that was part of the contract, was it not?

9  **A**      That is correct, it was or is.

10 **Q**      And part of the contract was also, I believe from the
11 affidavit, that they would keep business records and details
12 on those kinds of things?

13 **A**      Yes, sir, that's correct.

14 **Q**      And as an agent of HSI, you're also able to subpoena
15 and check sources with E-Verify to know in fact if somebody
16 has been E-Verified; correct?

17 **A**      Yes, sir.

18 **Q**      Did you do that in this case?

19 **A**      Yes, sir, we did.

20 **Q**      So, how many times was there an E-Verified proposal
21 submitted by Grand Family Enterprises to the E-Verify
22 office?

23 **A**      I can't say exactly, but around eight hundred.

24 **Q**      Eight hundred?

25 **A**      Yes, sir.

1  **Q**     Okay.  Now, E-Verify is a system that exists -- it's

2  a coordinating effort between Social Security and Homeland

3  Security; correct?

4  **A**     Yes, sir.

5  **Q**     And the intent with the organization is that Homeland

6  Security can bounce data off Social Security to determine

7  whether -- the illegal statuses and vice versa, they can

8  consolidate that and give the employer an answer?

9  **A**     My understanding of the system is that you check a

10 Social Security number, it does run off of Homeland Security

11 and Social Security Administration and comes back with one

12 of two choices.  Basically, it says they are okay to work or

13 it says they're -- and I don't remember the exact

14 terminology, but basically means they're not okay to work.

15 **Q**     And did you ask anybody down at Mar-Jac or let

16 anybody know at Mar-Jac that these folks were in fact using

17 E-Verify?

18 **A**     No, sir, I didn't.  Mar-Jac and this company are two

19 separate companies.

20 **Q**     Yes, sir.  I'm just asking.

21 **A**     No, sir, I did not.

22 **Q**     Does it make sense to you and common sense or your

23 sense as an investigator that somebody that, if they were

24 going to surreptitiously provide unlawful employment or

25 employment to unlawful aliens, would use E-Verify?

1  **A**     I guess it depends on whether or not they provided

2  the documentation for the individual.

3  **Q**     Okay.

4  **A**     You know --

5  **Q**     In other words, it would depend on whether or not

6  Mrs. Crystal here was giving them false information to begin

7  with and then E-Verify says good to go?

8  **A**     I guess that's a possibility, yes, sir.

9  **Q**     But that's what you were alluding to; correct?

10  **A**     I wasn't saying that's what they were doing, I just

11  said that it's possible for somebody to do that.

12  **Q**     You seized records and computers, have you guys --

13  well, let me strike that and ask the question this way:  Do

14  you have any way of knowing, as we sit here today, how many

15  people that GFE fired because they did not pass E-Verify?

16  **A**     I do not.

17  **Q**     Okay.  So, you sent eight hundred names up over the

18  course of -- and I'm going to use this because you testified

19  to the 2018 contract.

20  **A**     Yes, sir.

21  **Q**     -- over a period of potentially two years, but we

22  don't know how many of those were fired?

23  **A**     There's a place in E-Verify to, if somebody comes

24  back with a -- and I forgot the terminology exactly, but

25  basically that they are not -- their documents are not good

1    to work in the United States or not verifiable, maybe,

2    there's a place in the system to put a note that says

3    employee was terminated.

4    **Q**    Okay.

5    **A**    So, it's possible to find out how many but off the

6    top of my head I don't remember.

7    **Q**    Okay.  I guess comporting with, not remembering how

8    many, you wouldn't anticipate as part of your investigation

9    to match the names of those how many with the names of some

10   of the folks that were supposedly working there unlawfully,

11   you haven't matched those up at this point?

12   **A**    Well, actually, there are two individuals that were,

13   according to E-Verify, terminated by Grand Family Enterprise

14   that we did find working for Grand Family Enterprise.

15   **Q**    So they had been terminated by Grand Family

16   Enterprises, but they were still working for Grand Family

17   Enterprises?

18   **A**    That's correct.  Terminated in the E-Verify system,

19   but still working.

20   **Q**    Right.  Good answer.  Was there a point where you

21   investigated the business structure of Grand Family

22   Enterprises?  Do you know what I mean by that when I ask the

23   question?

24   **A**    No, I don't exactly.

25   **Q**    So, let's say you have the person that formed the

1    company or the persons that formed the company.  And we do

2    know from the affidavit that they had managers in the

3    company.

4    **A**    Yes, sir, that's correct.

5    **Q**    Because it was -- appeared, and I will refer you over

6    to page, I think it's ten or eleven, I mean, they had cards,

7    multiple telephone numbers; correct?

8    **A**    Yes, sir.

9    **Q**    Contact information with the manager's name on it?

10   **A**    That's correct.

11   **Q**    So we do know at least that there was an intermediary

12   hierarchy between the formers of the corporation or

13   Mrs. Crystal and the workers; correct?

14   **A**    According to the card, that's correct.

15   **Q**    Did you ask any of the managers whether or not they

16   had been told to fire by the boss and then the manager

17   didn't comply?

18   **A**    No, sir, I did not talk to any of the managers.

19   **Q**    Okay.  On Page 4, Paragraph 6, at the top you state,

20   on May 15th, 2019, HSI deportation officers unexpectedly

21   encountered Crystal Escalante during an enforcement

22   operation; is that correct?

23   **A**    Yes, sir.

24   **Q**    Interesting wording because I think, based on the

25   testimony down below on the same page, she encountered

1   y'all.  I'm not trying to do a goose and egg analogy.  But

2   you state that she approached a traffic stop and engaged

3   officers on her own volition; right?

4   **A**     Yes, sir.

5   **Q**     Without being questioned she told the officers that

6   the van belonged to her and all the occupants in the van

7   were her employees.

8   **A**     Yes, sir; that's correct.

9   **Q**     I bet you were scratching your head on that, because

10  that doesn't sound like somebody that's trying to

11  surreptitiously -- because you guys have got on ICE

12  uniforms; correct?  Don't you have some indication that you

13  guys are with ICE?

14  **A**     Depends on if you are in the middle of an operation.

15  During a traffic stop, I -- sometimes there are ICE shirts

16  or jackets.

17  **Q**     Well, just to clarify, this was -- she wasn't the one

18  that was stopped.  One of her vans had been stopped earlier

19  and then she was coming down the road, saw the van on the

20  side of the road, saw what obviously looked like government

21  officials around it, and stopped and volunteered this

22  information; correct?

23  **A**     Yes, sir.

24  **Q**     At the bottom of Page 4, part of this same encounter,

25  Escalante told officers that they were just here to work.

1   **A**      Yes, sir.

2   **Q**      Would you disagree with that statement that their

3   intent was they were here to work?

4   **A**      I can only go by what was said and what was reported

5   to me as being said.

6   **Q**      Would you disagree, looking at this affidavit as a

7   whole, that what is going on here, in one fashion or

8   another, is that people were looking for work that may not

9   be documented and through GFE they were being employed in

10  part or in whole with Mar-Jac, that this is about unlawful

11  employment?

12  **A**      I'm not sure I understand exactly what you're saying.

13  **Q**      Is the investigation in sum, the heart of it, the

14  core zone, is it about unlawful employment?

15  **A**      Unlawful employment is part of the investigation,

16  yes, sir.

17  **Q**      Because I think, if we go through about four pages on

18  this affidavit, I don't see anything but an investigation

19  about either the potential for or unlawful employment, do

20  you?

21  **A**      I believe there is unlawful employment.  There's also

22  unlawful transportation of these same individuals.

23  **Q**      To get to the employment?

24  **A**      Sure.

25  **Q**      I don't see anything else here.  So, if you know of

1   something, that this transportation was for any other reason

2   than employment, please let me know.

3   **A**      I don't know of anything, no.

4   **Q**      Okay.  And again, to make just quicker work of this.

5   All the transportation to employment appears to be open and

6   notorious from the time that Crystal jumps out of her

7   4Runner and says, what are you guys doing with my van and

8   employees, including your surveillance in the parking lot at

9   Mar-Jac.  What I mean by open and notorious is, they were

10  loading and unloading, loading and loading or taking people

11  to and from work and parking in the parking lots, not on the

12  sides of the buildings.  Unless of course it was an entrance

13  or an exit.  In other words, it looked like a normal pick up

14  and drop off operation, did it not?

15  **A**      Yes, sir.

16  **Q**      And the vans that they picked them up in were

17  registered in either Mr. Escalante or Mrs. Escalante's name;

18  correct?

19  **A**      Yes, sir.

20  **Q**      And duly registered with the State of Alabama, they

21  weren't registered with Iowa or some other place?

22  **A**      No, sir.  Alabama.  That's correct.

23  **Q**      Did it look to you like they were trying to conceal

24  anything?

25  **A**      No, sir.

**Q**      I noted in your affidavit that the process when they
pulled up in the parking lot to wait for the employees to
come out of the plant, that they had to wait from 7:45 until
8:10, according to your affidavit on Page 7.  And -- what
I'm -- what I want to ask you here, that doesn't seem like a
special forces operation or a quick not detectus type of
operation, would that be a fair statement?  On Page 7,
Officer Rogers.

**A**      Yes, sir.

**Q**      That's at the top.

**A**      Yes, sir.  I mean, it wasn't like a special forces
operation, no.

**Q**      Like in -- you have got to get your people in the
van, get them out of there, and vague detection.

**A**      No, sir.

**Q**      At one point y'all used -- y'all call them a source
or an informant, and correct me if I'm wrong, but what it
sounds like to me is that you send them in there, you send
them to, wired up and he approached three Hispanic males and
about the time he approached them, I think somebody, it's
fair to say, based on the tag and everything and the
4Runner, Crystal arrived and your source told Crystal that
he was looking for work.

**A**      Correct.

**Q**      And I think you would agree that it's a fair

1    statement and knowing that you are a consummate

2    professional, if you're going to send a source in there,

3    that you're sending the source in looking for information,

4    so you're giving that source some guidance on what to say or

5    what to ask.

6    **A**     Yes, sir.

7    **Q**     And the source didn't ask the question, hey, do you

8    know how I can, you know, I crossed the border six months

9    ago, and do you know how I can get from Alabama to New York,

10   that wasn't one of the questions you gave the source, was

11   it?

12   **A**     No, sir.

13   **Q**     And you didn't tell the source to say, hey, I have

14   only been in the country six months to a year?

15   **A**     No, sir.

16   **Q**     Or that he just arrived in Alabama, you didn't tell

17   the source that?

18   **A**     No, sir.

19   **Q**     Or state that?

20   **A**     No, sir.

21   **Q**     But the source did say he was illegal and he didn't

22   have papers to work, but he's told he needed a driver's

23   license.  You got any idea why?

24   **A**     Yeah.  But there's not what -- that's not part of the

25   discussion with Crystal.

1  **Q**     That's with Mr. Escalante?

2  **A**     That's correct.

3  **Q**     Why would you need a driver's license?  To drive?

4  **A**     To drive.

5  **Q**     It's one of those brilliant attorney questions.

6          But how would you get a driver's license -- you

7  can't get a driver's license without documentation; correct?

8  Legally.

9  **A**     Not legally, no.

10  **Q**     Okay.  At least in Alabama you have to have some

11  application pending or in some cases be a resident or

12  application for residency, something like that.

13  **A**     I believe so, yes.

14  **Q**     Take it to the end.  So, finally, on or about

15  September 29th, I'm on the end of Page 11 going to 12.

16  **A**     Yes, sir.

17  **Q**     Y'all had Alabama Sheriff's Deputy Carpenter conduct

18  a traffic stop -- let me rephrase that, that's not what you

19  say.

20          Walker County, Alabama Sheriff's Deputy Carpenter

21  conducted a traffic stop on a white passenger van with

22  Alabama tag registered to Deivin Escalante; correct?

23  **A**     Yes, sir.

24  **Q**     And as part of the surveillance on that date, he had

25  just been previously seen leaving the parking lot at 8:10 of

1   Mar-Jac; correct?  That van.

2   **A**      Correct.

3   **Q**      And y'all detained fourteen occupants, all foreign

4   nationals, correct, without legal status?

5   **A**      Fifteen total.

6   **Q**      Fifteen.  One was under the age of eighteen; correct?

7   **A**      Well, the driver, plus fourteen more.

8   **Q**      Okay.  If you look at Page 12, y'all state that two

9   of the fifteen occupants were under the age of eighteen.

10  **A**      That's correct.

11  **Q**      And one of the minors had in his possession a

12  Tuscaloosa County School System Withdrawal Notice; correct?

13  **A**      Yes, sir.

14  **Q**      Does that not indicate to you that this child had

15  been at least registered for school?

16  **A**      Yes, sir.

17  **Q**      And then in sum, the next pages, bottom of Page 12

18  and 13, going all the way through 15, talk about y'all

19  processing these fifteen individuals.  And the one thing

20  that stood out to me, and I want to ask you about, if they

21  were all, looks like most of them anyway, based on the

22  volume here, were all carrying some type of identification

23  or business card that identified their employer as Grand

24  Family Enterprises; correct?

25  **A**      They either had a business card or some type of

1   access card.  No identification.

2   **Q**     And this is where we had spoken earlier about all the

3   following names were managers and family members.

4   **A**     Yes, sir.

5   **Q**     And I noticed on the bottom of Page 12 where it says,

6   very bottom where it says, the following names were managers

7   and phone numbers -- one, two, three, four, five, six, seven

8   managers.  No, no.  I stand corrected.  Five.  Paragraph B

9   is about something else.  Very bottom of 12, five managers,

10  or at least cards identifying them as managers.

11  **A**     Four.

12  **Q**     Four?

13  **A**     Yes, sir.

14  **Q**     I won't disagree with you.  And plenty of information

15  on those cards to be able to contact those managers.

16  **A**     That's correct.

17  **Q**     Of any of those managers you detained, did you ask

18  any of them questions about where they live?

19  **A**     Out of the fifteen on that date, yes, sir.

20  **Q**     How long they resided there?

21  **A**     I didn't process all fifteen, but more than likely

22  that was probably asked.

23  **Q**     How long they had been in the State of Alabama, would

24  that be a question on one of your investigation forms?

25  **A**     No, sir.

1  **Q**     Based on your affidavit and based on the fact that

2  you testified this investigation was in sum about unlawful

3  employment, do you have any information that Mrs. Crystal

4  was engaged in smuggling people across the border?

5  **A**     No, sir.

6  **Q**     Do you have any information that her being in the

7  United States that she was furthering the aims of a smuggler

8  who had taken them across the border?

9  **A**     No, sir.

10  **Q**     Do you know what I mean by that?

11  **A**     Yes, sir.

12  **Q**     Like somebody takes them to Louisiana and then

13  somebody from Louisiana takes them to New York as part of a

14  process?

15  **A**     Yes, sir, I understand.

16  **Q**     And the answer is no; right?

17  **A**     The answer is no.

18  **Q**     Lastly, in the investigation as a whole, in terms of

19  the parking, in terms of statements and pulling up to ICE

20  officials, did you see anything that you would consider to

21  be an activity that was surreptitious?

22  **A**     When she pulled up to the -- sorry.  When she pulled

23  up to the deportation officers, they explained to her that

24  two of her employees were illegal.  She said they are just

25  here to work.

1    **Q**    Okay.

2    **A**    So --

3    **Q**    That's not a lie.

4    **A**    No.

5    **Q**    Okay.  And as a matter of fact, I'm a little bit

6    shocked by the openness of that.  She pulled up to y'all's

7    headquarters over there off of -- I always want to say

8    Valley, over there at y'all's address.  And -- okay.

9              MR. BINGHAM:  Officer Rogers, thank you very much

10    and that is all I have, Your Honor.

11              THE COURT:  Mr. Reid.

12                          CROSS-EXAMINATION

13    BY MR. REID:

14    **Q**    Good afternoon, Officer Rogers.

15    **A**    Good afternoon, sir.

16    **Q**    I will try not to be repetitive and move along, but

17    just to cover a couple of things.

18              What is the date that your investigation began on

19    the Grand Family Enterprises or Deivin Escalante?

20    **A**    July 2018.

21    **Q**    So, roughly two years and a couple of months?

22    **A**    Yes, sir.

23    **Q**    We'll call it twenty-six months?

24    **A**    More or less.

25    **Q**    Okay.  And during that twenty-six months, you, in

1   your affidavit, you referenced that there is a call that was

2   initiated by one of your sources to Deivin Escalante; is

3   that correct?

4   **A**      That's correct.

5   **Q**      Is there any other times that you or a source of

6   yours has made a direct communication with my client Deivin?

7   **A**      Yes.

8   **Q**      What are those?

9   **A**      Spoke to a gentleman at a house in Jasper and asked

10  about a house next door.

11  **Q**      You spoke to a gentleman, are you saying that

12  gentleman was Mr. Escalante?

13  **A**      I found out that it was Mr. Escalante, yes.

14  **Q**      What was the substance of that conversation?

15  **A**      I asked who owned the house next door to his and was

16  it for sale -- did he know if it was for sale.

17  **Q**      What was his answer?

18  **A**      He told me that he thought that the owner of that

19  house was trying to sell it.

20  **Q**      Was there any substance of that conversation about

21  employing workers for the poultry plant or E-Verify or any

22  kind of documentation system?

23  **A**      No, sir.

24  **Q**      So that conversation that you had with Mr. Escalante

25  was purely innocuous and had no relevance to this

1  investigation?

2  **A**      That's correct.

3  **Q**      Is there any other time besides that time and the

4  call that you made that you had any direct contact or any

5  source of yours had direct contact with Mr. Escalante?

6  **A**      Mr. and Mrs. Escalante arrived at our building to

7  pick up individuals that we had arrested.

8  **Q**      Okay.  How many?

9  **A**      How many what?

10 **Q**      Individuals.

11 **A**      They came to pick up, I assume, I assume they came to

12 pick up all -- everybody that we arrested.

13 **Q**      How many was that?

14 **A**      Fifteen.

15 **Q**      Was that the fifteen in the van on the stop?

16 **A**      On September 29th; that's correct.

17 **Q**      Okay.  Any other time?

18 **A**      I don't recall another time, no, sir.

19 **Q**      When they picked up these fifteen individuals, was

20 there anything illegal about them driving them back from

21 wherever they were residing?

22 **A**      As a matter of fact, yes, sir.

23 **Q**      So you witnessed them and allowed them to commit an

24 illegal act in your presence?

25 **A**      Yes.

 1    **Q**      You didn't go out there and say, hey, you're about to

 2    commit an illegal act, you don't need to do that, somebody

 3    else needs to pick them up; is that --

 4    **A**      I had an investigation and we weren't ready to make

 5    the arrest yet.

 6    **Q**      Besides that, any other time that you saw them do

 7    anything that you believe or allege was illegal?

 8    **A**      I don't recall, no.

 9    **Q**      You talk about seizing -- is it four or five bank

10    accounts?

11    **A**      Five.

12    **Q**      What's the most that was in any one individual bank

13    account?

14    **A**      One hundred ninety-nine thousand and some change.

15    **Q**      So one hundred ninety-nine and -- you said the total

16    was five hundred and something; is that right?

17    **A**      Four hundred eighty something.

18    **Q**      Four eighty.

19    **A**      Yes, sir.

20    **Q**      So almost half of the four eighty was in one account;

21    is that correct?

22    **A**      Yes, sir.

23    **Q**      What was the title of that account?

24    **A**      Off the top of my head, I don't recall exactly which

25    account had how much money.

1   **Q**     Was it a personal account or was it a business

2   account?

3   **A**     There were two large amounts -- there were large

4   amounts in two different accounts.

5   **Q**     Was it a personal account or business account?

6   **A**     That one specifically, I do not remember.

7   **Q**     Was that the one that your -- your earlier testimony

8   alleged that Ms. Escalante tried to transfer one hundred

9   forty something thousand dollars out of?

10  **A**     Yes, sir, I believe -- so --

11  **Q**     You testified earlier it was a business account.

12  **A**     Yeah.  I was trying to remember the numbers on the

13  account, that's how I remember which account is which.  That

14  account, yes, sir, had one hundred ninety-nine and it was a

15  business account.

16  **Q**     You don't recall if they were called the GFE

17  operating account or GFE payroll account or the GFE tax

18  account, you don't remember any of those names?

19  **A**     They do have a GFE account.  They also have a GFE

20  payroll account.  I believe this one is the GFE account.

21  **Q**     The operating account?

22  **A**     I don't remember it saying operating account, but

23  yes, sir.

24  **Q**     It wasn't payroll account?

25  **A**     No, sir, it was not.

1    **Q**    Did you seize the payroll account, too?

2    **A**    Yes, sir.

3    **Q**    How much money was in it?

4    **A**    I don't remember exactly.  I can tell you the

5    amounts.  I cannot tell you exactly what was in each

6    account.

7    **Q**    Do you know approximately how much was in the payroll

8    account?

9    **A**    Not off the top of my head, no, sir.  Not without

10   referring to each account, no, sir.

11   **Q**    Okay.  That's two of the four accounts; is that

12   right?

13   **A**    Five.

14   **Q**    Two of the five accounts.  What were the other three,

15   if you remember?

16   **A**    One is a checking account, specifically for the

17   family.  One is a savings account, specifically for the

18   family.  And one is a savings account for the son.

19   **Q**    Okay.  So they've got operating account, or we'll

20   call it business account, payroll account, their family

21   checking account, their family savings account --

22   **A**    Yes, sir.

23   **Q**    -- and then their son had an account?

24   **A**    That's correct.

25   **Q**    How much money was in the son's account?

1    **A**    Sixty thousand and some change.

2    **Q**    His name only?

3    **A**    No, his name and Crystal's.

4    **Q**    Deivin wasn't on it?

5    **A**    No, sir.

6    **Q**    So Deivin was only on four accounts?

7    **A**    Yes, sir.

8    **Q**    You answered some questions about Deivin's

9    citizenship; is that correct?

10   **A**    I did.

11   **Q**    Do you know the date that he received a permanent

12   resident card?

13   **A**    I don't know the exact date.  I believe it was some

14   time in 2018.

15   **Q**    2018?

16   **A**    I believe so, yes, sir.

17   **Q**    And you testified that he has to be a permanent

18   resident for a period of time before he can petition for

19   citizenship; is that correct?

20   **A**    That's correct.

21   **Q**    What is that period of time?

22   **A**    Three years, if you're married to a U.S. citizen.

23   **Q**    So he hasn't spent the time as a permanent resident

24   to be able to apply for citizenship; is that correct?

25   **A**    That's correct.

1   **Q**     So, when Mr. Penfield was asking you why he hasn't
2   applied for citizenship, he wasn't eligible to; is that
3   correct?

4   **A**     I don't think Mr. Penfield asked me why.

5   **Q**     He said he hadn't.  But he wasn't eligible to try; is
6   that right?

7   **A**     That's correct.

8   **Q**     Now, his status here is completely legal; is that
9   correct?

10  **A**     It is, yes, sir.

11  **Q**     Does Homeland Security or Immigration and Customs
12  Enforcement keep up with how many times someone crosses the
13  border in and out of the United States?

14  **A**     For the most part, yes, sir.

15  **Q**     As a part of your investigation, have you
16  investigated or looked at how many times Mr. Escalante has
17  crossed in and out of the United States in the past or just
18  say for the twenty-six months of your investigation?

19  **A**     No, sir, I have not.

20  **Q**     Any reason you haven't?

21  **A**     He's a permanent resident.  He can come and go as he
22  pleases.

23  **Q**     And you saw his passport today?

24  **A**     I saw his new passport.

25  **Q**     Anything improper or nefarious about that passport

1   that struck out to you?

2   **A**      No, sir.

3   **Q**      How much have you investigated the operations of

4   Mar-Jac Poultry in Jasper, Alabama?

5             MR. PENFIELD:  Objection as to relevance, Judge.

6             MR. REID:  I'll be more specific.

7   **Q**      Do you know how many people work at that facility?

8   **A**      I do.

9   **Q**      How many?

10  **A**      More or less.

11  **Q**      How many?

12  **A**      Counting the ones that the Escalantes provided?

13  **Q**      How many people work there, total.

14  **A**      Just Mar-Jac or counting the ones they provided?

15  **Q**      All employees.

16  **A**      Eleven hundred possibly.

17  **Q**      How many GFE employees work there?

18  **A**      I'm not a hundred percent sure about the amount of

19  employees that work there.  I would say between, maybe

20  around one hundred fifty, two hundred, somewhere in there.

21  **Q**      So one fifty to two hundred --

22  **A**      Something like that, yes, sir.

23  **Q**      As part of your investigation have there ever been

24  GFE employees who transitioned and became Mar-Jac employees?

25  **A**      I don't know the answer to that.

1   **Q**    Okay.  You testified that they had accessed E-Verify

2  around eight hundred times.

3   **A**    Something like that, yes, sir.

4   **Q**    And by your later testimony, it's fair to say they

5  don't have eight hundred people working of the eleven

6  hundred at Mar-Jac; is that correct?

7   **A**    That's fair to say, yes.

8   **Q**    Is it your testimony today that all one hundred fifty

9  of those employees are undocumented and illegal?

10   **A**    No, sir, that's not my testimony.  My testimony, I

11  can only talk about the ones that we've encountered.  And

12  all of them were illegal.

13   **Q**    And how many is that total that you encountered?

14   **A**    Total, over the period of two years?

15   **Q**    Yeah.

16   **A**    Okay.  Approximately eighty.

17   **Q**    Eighty?

18   **A**    Yes, sir.  That's a guesstimate.

19   **Q**    And at the time you encountered those were they all

20  working at the same time for Mar-Jac?

21   **A**    All eighty at the exact same time?

22   **Q**    Yes.

23   **A**    No, sir.  It was over a period of two years.

24   **Q**    All right.  At any one time how many illegal

25  employees have you identified working through GFE for

1    Mar-Jac?

2    **A**    The most recent encounter was thirty-seven.  A month

3    before that was fifteen.

4    **Q**    Is it fair to say that the most you have ever seen at

5    one time, if they have one hundred fifty to two hundred

6    working, that is between ten and twenty percent?

7    **A**    The most that we've encountered and processed, yes,

8    I'm sure, twenty percent, thirty percent, something like

9    that.

10    **Q**    So, if we can take the reverse of that, at any one

11    time, seventy percent of the people working there through

12    GFE are on legal status and legally can be employed?

13    **A**    It has been my experience over twenty-four years that

14    if a -- if every person that you encounter in an employment

15    situation is illegal, there's a chance that the rest are

16    illegal.

17         Now, can I say one hundred percent those are

18    illegal?  No, sir.  Do I believe they are illegal?  Yes,

19    sir.

20    **Q**    So it's your testimony today, it's your belief, that

21    every employee working for GFE is not legally qualified to

22    work?

23    **A**    I can't say every.  But I would say, I would think a

24    majority, yes, sir.

25    **Q**    If you were to see proof otherwise, you would be

1    surprised?

2    **A**    If I got to interview them, yeah, I would be

3    surprised.

4    **Q**    Is it your testimony today that Deivin Escalante has

5    provided fraudulent documentation to people that work for

6    GFE?

7    **A**    I'm sorry.  Did you say is that my testimony?

8    **Q**    Is that your belief.

9    **A**    That he's provided illegal -- I mean, documentation

10   to his employees?

11   **Q**    Yes.

12   **A**    I don't have any proof of that, no.

13   **Q**    Okay.  Assuming that GFE has one hundred fifty

14   employees at Mar-Jac and there's another nine hundred and

15   fifty there, are you saying that all of those are documented

16   illegal?

17   **A**    Am I saying what?

18   **Q**    Is it your belief or your testimony that those are

19   all documented illegal people to be working?

20   **A**    Where?  At --

21   **Q**    At Mar-Jac.

22   **A**    At Mar-Jac?

23   **Q**    Outside the GFE employees.

24         MR. PENFIELD:  Judge, objection as to relevance.

25   It's about GFE.

1          THE COURT:  I understand the objection.  I will

2     let you ask that question.  It's overruled.

3     **Q**    (By Mr. Reid)  Are all of Mar-Jac's employees that

4     are not GFE employees legal?

5     **A**    I believe -- well, I haven't interviewed any of them,

6     but there's a possibility that no, not all of them are

7     legal.

8     **Q**    Does that make Mar-Jac in violation of law, too?

9          MR. PENFIELD:  Objection as to relevance, Judge.

10         THE COURT:  Overruled.

11    **A**    I haven't -- I'm not sure I can talk about that.

12         MR. REID:  He overruled.  You don't have to

13    answer.

14         THE COURT:  I missed what you said just then.

15         MR. REID:  I thought he was going to try to

16    answer.  I just said the judge overruled -- I mean,

17    sustained the objections to --

18         THE COURT:  There's not been an objection.  No, I

19    don't want you to get into something that would relate to

20    another investigation, if there is an investigation.  I'm

21    certainly not assuming that there is one.  I will allow that

22    line of questioning just to the extent that it impacted the

23    witness' credibility.  You can go forward.

24    **Q**    (By Mr. Reid)  Has the majority of your

25    investigation -- strike that.

1          You seized a lot of assets in relationship to this

2   investigation; is that correct?

3   **A**     Yes, sir.

4   **Q**     That included cash assets?

5   **A**     Yes, sir.

6   **Q**     Included vehicles?

7   **A**     Yes, sir.

8   **Q**     How many vehicles did you say it was?

9   **A**     Six.

10  **Q**     Six.  What were they?

11  **A**     2020 Mercedes GLS 450; 2020 Chevy RST; SCA Black

12  Widow; 2020 Chevy Z71 four-wheel drive pickup; a 2020 Toyota

13  Camry; a 2019 Toyota 4Runner; and a 2016 Maserati Ghibli.

14  **Q**     Did you check registered ownership of all those

15  vehicles?

16  **A**     Yes, sir.

17  **Q**     Who were they registered to?

18  **A**     Either Deivin or Crystal or both.

19  **Q**     All right.  Which ones are registered just to Deivin?

20  **A**     I don't know off the top of my head.  I would have to

21  look at the documents.

22  **Q**     Of the six do you know how many were registered just

23  to him?

24  **A**     No, sir.

25  **Q**     All the property that was seized, there was some real

1  property that was liened or seized in this investigation; is

2  that correct?

3  **A**     Yes, sir.

4  **Q**     Where was all of that property located?

5  **A**     Some was in Haleyville; some was in Jasper.

6  **Q**     Were those commercial locations or residential

7  locations?

8  **A**     Some of both.

9  **Q**     How many of each?

10  **A**     Define what you mean by commercial.

11  **Q**     Not a residence.

12  **A**     You mean a residence -- you mean rental property or

13  do you mean --

14  **Q**     How many of the properties would qualify as a

15  residence?

16  **A**     Seven.

17  **Q**     And how many would qualify as a commercial location?

18  **A**     One.

19  **Q**     So eight in total?

20  **A**     Yes, sir.

21  **Q**     The residential properties, were they houses?

22  **A**     Yes, sir, with multiple units -- well, that's not

23  true about all of them.  But some of them were multiple

24  units, but yes.

25  **Q**     You mean like a duplex?  Apartment building?

1    **A**      One is a duplex.  A couple have the ability to be

2    rented out as separate apartments.

3    **Q**      Were they all occupied?

4    **A**      I'm not one hundred percent sure, but I believe that

5    one, possibly two, were not.

6    **Q**      Your investigation references a lot -- several

7    passenger vans.  Were any of those seized?

8    **A**      When we stopped the three vans, those three vans were

9    towed and at this point have not been seized.

10   **Q**      All the others like in Paragraph 7 where you list

11   one, two, three, four passenger vans, Paragraphs A, B, C and

12   D, were any of those four vehicles seized?

13   **A**      Paragraph 7 you said?

14   **Q**      Yes, Page 5.  To your knowledge were any of those

15   four vehicles seized?

16   **A**      I don't remember these tags being the tags on the

17   vehicle, of the exact -- no vans have been seized at this

18   moment.

19   **Q**      Are you saying these tags weren't the tags that were

20   on the vehicles?

21   **A**      I don't recall these tags, no, sir.

22   **Q**      Well, they must be correct because they're in your

23   affidavit; right?

24   **A**      I'm sorry?

25   **Q**      They must be correct because they're in your

1  affidavit; right?

2  **A**      It's correct as far as these are the vehicles that I

3  saw on that date or that -- yes, that I saw on that date.

4  **Q**      And two of those you said were registered to Deivin

5  Escalante and one to Crystal and one to an individual whose

6  name is blacked out; is that correct?

7  **A**      Yes, sir.

8  **Q**      But you're not sure if those are the tag numbers?

9  **A**      No, sir, I'm not.

10  **Q**      Paragraph 8 lists two vans there, one registered to

11  Deivin Escalante and another to an individual and the name

12  is blacked out.  Those haven't been seized, have they?

13  **A**      The one that's blacked out, no, it wasn't.

14  **Q**      What about the one that is registered to Deivin

15  Escalante?

16  **A**      I don't remember if that's the tag number or not.

17  **Q**      Same question on Paragraph 9, if you remember,

18  there's three listed there.  Two to Deivin, one to Crystal.

19  **A**      I can tell you that the vehicles that were stopped

20  were not a 2005 or a 2006 van.

21  **Q**      Okay.

22  **A**      But I do not recognize these tags as being the ones

23  that -- I mean, they could be, but I can't tell you because

24  I can't remember.

25  **Q**      Did you ever see Deivin Escalante driving one of

1  these vans?

2  **A**      No, sir.

3  **Q**      On the date that the fourteen or fifteen individuals

4  were released from your custody that were picked up in a

5  van, who was driving that day?

6  **A**      An individual named Tomas Gabriel.  The second last

7  name is Adjualip.

8  **Q**      Was Deivin Escalante present?

9  **A**      No, sir, not at the stop, no, sir.

10  **Q**      No.  I mean, when they came to pick them up at your

11  office.

12  **A**      Oh, yes, sir, he was.

13  **Q**      Was he driving?

14  **A**      When I saw him he was standing.

15  **Q**      Did you see him drive the individuals away?

16  **A**      I don't recall him driving them away, no.  There were

17  two vehicles that picked them up, so I don't know who was

18  driving the second vehicle.

19          MR. REID:  No further questions at this time, Your

20  Honor.

21          THE COURT:  Any redirect?

22          MR. BINGHAM:  No, Your Honor.  Thank you.

23          THE COURT:  Thank you.

24          THE WITNESS:  Thank you, sir.

25          THE COURT:  Any other witnesses for the

1   government?

2         MR. PENFIELD:  No, Your Honor.

3         THE COURT:  I will hear -- any witnesses from the

4   defense?

5         MR. REID:  Your Honor, we would call Mr. Hubert

6   Maxwell Holt.

7              HUBERT MAXWELL HOLT, SWORN

8         THE CLERK:  State your name for the record and

9   spell it.

10        THE WITNESS:  Hubert Maxwell Holt.  H-U-B-E-R-T,

11  M-A-X-W-E-L-L, H-O-L-T.

12                 DIRECT EXAMINATION

13  BY MR. REID:

14  **Q**    Mr. Holt, you go by Max; is that right?

15  **A**    Yes, sir.

16  **Q**    And are you employed?

17  **A**    No, sir, I'm retired.

18  **Q**    Where are you retired from?

19  **A**    The Alabama Law Enforcement Agency, formerly known as

20  the Department of Public Safety.

21  **Q**    What capacity were you employed with the Department

22  of Public Safety or ALEA?

23  **A**    I was a state trooper.

24  **Q**    Were you assigned to a specific area?

25  **A**    I was assigned to Winston County out of the Hamilton

1    Post.

2    **Q**    Okay.  Where do you reside?

3    **A**    I live in Haleyville.

4    **Q**    And you're here today -- you haven't been subpoenaed

5    to come here today; is that correct?

6    **A**    No, sir.

7    **Q**    And you are here by a volunteer basis?

8    **A**    Yes, sir.

9    **Q**    Mr. Holt, do you know my client sitting at the end of

10   the table here?

11   **A**    Yes, sir.

12   **Q**    And would you identify him to the Court?

13   **A**    Deivin, I can't pronounce his last name.  I'm sorry.

14   **Q**    Escalante?

15   **A**    Escalante, yes, sir.

16   **Q**    Do you know Mr. Escalante?

17   **A**    Yes, sir, I know him and his wife both.

18   **Q**    How long have you known him?

19   **A**    Ten, twelve years.

20   **Q**    And in what capacity have you had an encounter or an

21   occasion to know them?

22   **A**    They used to run a restaurant in Haleyville, it was a

23   little restaurant/grocery store that when I was working, me

24   and my wife would go there and eat dinner, lunch, buy

25   groceries occasionally.

**Q**      And how long do you know that they operated that

location?

**A**      I believe they ran it for about four or five years.

**Q**      Okay.  And did you, I guess on occasions, have a

chance to see them out away from that establishment?

**A**      Yes, sir.  Deivin and his son had both been to my

house before.  I have a shop that I restore old cars in and

they came to the shop to, you know, check out my cars and

things like that.

**Q**      Okay.  So would you say y'all are friends?

**A**      Yes, sir.

**Q**      And when you talk about his son, how old is his son?

**A**      I'm not sure his age, I think at that time he was

around five or six years old.

**Q**      Okay.  And you, being in law enforcement, have you

ever seen him engage in any illegal activities?

**A**      Not --

**Q**      Out in the community?

**A**      No, sir.

**Q**      Anything illegitimate about, that raised suspicion on

your behalf?

**A**      No, sir.

**Q**      Appeared to just be a business person operating a

business in the community?

**A**      Yes, sir.

1    **Q**      Appeared to be a hard worker?

2    **A**      Yes, sir.

3    **Q**      Appear to be a good family man?

4    **A**      Yes, sir.

5    **Q**      His family well cared for?

6    **A**      Yes, sir.  He was in the midst of remodeling his

7    house at one time, and he came to me and asked me to borrow

8    some of the tools I had in my shop.  I just built my shop.

9    And he borrowed some power tools from me.  And I didn't

10   anymore think twice about that, loaned them to him and, you

11   know.

12   **Q**      He return them?

13   **A**      Of course he did.  I wasn't worried about it.  I knew

14   where they were, you know.

15   **Q**      So you had occasion to see his house as well; is that

16   correct?

17   **A**      Yes, sir.  I have had Christmas dinner at his house.

18   **Q**      Would you say that he has strong and significant ties

19   to the Haleyville community?

20   **A**      Yes, sir, I would.

21   **Q**      Okay.  And you said about ten years is how long you

22   have known him?

23   **A**      Yes, sir.

24   **Q**      And that's ten years going back from today; is that

25   correct?

1    **A**      Yes, sir.

2    **Q**      Continuous?

3    **A**      Yes, sir.

4         MR. REID:  I have no further questions.  Answer

5    Mr. Bingham's questions, please.

6                   CROSS-EXAMINATION

7    BY MR. BINGHAM:

8    **Q**      Mr. Holt, with the exception of the time in the shop

9    with Mr. Deivin and his son, and I'm making an assumption

10   which may or may not be right, was Mrs. Crystal with him?

11   I'm assuming she wasn't.

12   **A**      Not when they came to the house to borrow my tools,

13   no.

14   **Q**      Other than that, is everything that you testified in

15   response to the attorney's questions, would you say the same

16   things about Mrs. Crystal because you've had association

17   with her?

18   **A**      Yes.  She used to work at the restaurant.  As a

19   matter of fact, I think she was the one that cooked our food

20   for us and prepared it.  But, yes, I would -- I would trust

21   her with my wife out, my family, anything.

22   **Q**      Right.  And you had the opportunity to view how their

23   son, their oldest son behaved?

24   **A**      Yes.

25   **Q**      Was there anything that would suggest that the apple

1   had not fallen far from the tree?

2   **A**      No.  He was a hard working young man, very

3   respectful.  I haven't got anything bad to say about either

4   one of the kids.

5          MR. BINGHAM:  Thank you, sir.  No further

6   questions.

7          THE COURT:  Any questions from the government?

8          MR. PENFIELD:  No, Your Honor.

9          THE COURT:  Thank you, Mr. Holt.

10          MR. REID:  Mr. Benefield, Your Honor.

11          MR. PENFIELD:  Judge, if I can interrupt my

12   colleague and friend.  Are we moving into just character

13   witnesses for purposes of argument down the road?  Just so I

14   know.

15          THE COURT:  It's my preference to receive all of

16   the testimony at once and then we'll have argument at the

17   conclusion of the testimony.

18          MR. PENFIELD:  Yes, Your Honor.  Thank you.

19          MR. REID:  We'll try to be brief.

20              ROYCE BENEFIELD, SWORN

21          THE CLERK:  State your name for the record and

22   spell it.

23          THE WITNESS:  Royce W. Benefield.  R-O-Y-C-E, W

24   middle initial, B-E-N-E-F-I-E-L-D.

25

DIRECT EXAMINATION

BY MR. REID:

**Q**     Mr. Benefield, where do you live?

**A**     I live in Haleyville, Alabama.

**Q**     How long have you been in Haleyville, Alabama?

**A**     Practically all my life.

**Q**     And --

**A**     I'm sixty-five.

**Q**     So, roughly sixty-five years?

**A**     Practically.

**Q**     Are you employed?

**A**     Self-employed.

**Q**     And what type of work do you do?

**A**     I import artificial flowers, pool supplies and contributing in twenty-one states.  I'm in the concrete business and have a real estate company I deal with.

**Q**     Okay.  So you're multi-faceted?

**A**     Yes, try to earn a little money; tough times.

**Q**     Do you know my client Deivin Escalante?

**A**     I certainly do.

**Q**     How do you know Mr. Escalante?

**A**     He and I -- he's -- we first met -- he did some work for me.  And then he opened a store in Haleyville.  And I talked to him more there.  He and I have been knowing each other and have friendship over the past nine, eight, seven,

1    something like that, nine years, eight years.  Any time that

2    he needed anything or I needed anything, we were always

3    there to listen to each other.

4    **Q**    You always found him to be forthright and to your

5    knowledge honest?

6    **A**    Never a doubt in my mind.

7    **Q**    You said he operated a business there in Haleyville

8    along with his wife?

9    **A**    I knew they operated a business, yes, sir.  They

10   operated a couple of businesses.  I think they owned a cafe,

11   grocery store, something together.  And then they did lawn

12   mowing.  They were really industrious people.  They worked

13   hard.

14   **Q**    Worked hard.  And did that extend to their family,

15   other family members worked hard?

16   **A**    I never saw one of them that didn't.  They worked

17   when everybody else was going home.

18   **Q**    Would you say Mr. Escalante has strong and deep ties

19   to the community there in Haleyville?

20   **A**    I think he does.  He's spoken several, several times

21   how wonderful Haleyville was and how he wanted to be a part

22   of it.

23   **Q**    Do you perceive him in any way to be a risk of

24   flight?

25   **A**    No, sir.  I don't have any reason to believe that at

1  all.

2          MR. REID:  I have nothing further, Your Honor.

3                    CROSS-EXAMINATION

4  BY MR. BINGHAM:

5  **Q**    Besides the businesses and work you're doing, is it

6  correct that you're also an ex-council member in Haleyville?

7  **A**    Ex-council member, ex-school board member prior to

8  that.  I have served thirty some odd years in public office

9  in Haleyville.

10  **Q**    And have you had an opportunity to meet or know

11  Mr. Escalante's wife Crystal?

12  **A**    I certainly did.  I knew Crystal probably before I

13  knew Deivin.  Crystal worked in the local market there as a

14  cashier.  And I met her there prior to meeting Deivin and

15  knowing that they were married.  She was always friendly and

16  did her job well and quiet, quiet.

17  **Q**    Is there anything negative about her reputation in

18  the community?

19  **A**    I have never heard a word.

20  **Q**    Anything that would, of course, small town, anything

21  that would speak to a lack of character?

22  **A**    I promise you, if there was, it would be told there.

23  It's a small town.  As far as I know her character is

24  impeccable.

25  **Q**    If she states to the Court that she's going to stay

1    here with respect to a bond, would you believe her to stay

2    here with respect to a bond?

3    **A**      Yes, sir, I absolutely would.

4    **Q**      Is there any reason for you to believe she is a

5    danger to the community?

6    **A**      No, sir.

7    **Q**      Have you ever seen her drunk?

8    **A**      No, sir.

9    **Q**      Using drugs?

10   **A**      No, sir.

11            MR. BINGHAM:  Thank you, sir.

12            THE COURT:  Anything further for this witness?

13            MR. PENFIELD:  No, sir.

14            THE COURT:  You may step down.

15            MR. REID:  We call Mr. Robert Ison.

16                      ROBERT ISON, SWORN

17            THE CLERK:  State your name for the record.

18            THE WITNESS:  Robert Ison.

19            THE CLERK:  Spell your last name, please.

20            THE WITNESS:  I-S-O-N.

21                      DIRECT EXAMINATION

22   BY MR. REID:

23   **Q**      Mr. Ison, where do you live?

24   **A**      Haleyville.

25   **Q**      How long have you been a resident of Haleyville,

1    Alabama?

2    **A**      Thirteen years.

3    **Q**      While you have been a resident of Haleyville,

4    Alabama, have you had a chance to meet or know my client

5    Deivin Escalante?

6    **A**      Yes, sir.

7    **Q**      How do you know him?

8    **A**      I first met him, I have a concrete plant, we poured a

9    lot of concrete.  He was building a soccer field for the

10   children there in Haleyville, and that's the first time I

11   met him.  It's been about three years ago.  We poured a lot

12   of concrete down there.

13   **Q**      Where was his project at?

14   **A**      Where was what?

15   **Q**      The soccer field.

16   **A**      It's right behind his house.

17   **Q**      Was it for his children or a community project?

18   **A**      Community.  He was building it to -- hoping all kids

19   from around there, all children would play in the soccer

20   field.

21   **Q**      Given that, did you know him in any other context

22   besides your concrete business?

23   **A**      No.  Just from where he bought the -- bought sand and

24   gravel and stuff from us and the ready-mix.  I have seen him

25   on the street a lot, but three years and that's just it.

1   **Q**     Did you ever frequent a business he and his wife

2   owned in Haleyville?

3   **A**     Yes.  I have -- I stopped there and then -- he had a

4   place where they emptied their trash and stuff to pick up,

5   and I poured some concrete stuff in there, and every time I

6   see him outside, I stopped and talked to him.

7   **Q**     Given your context of knowing him, would you say he

8   has strong ties to the community there in Haleyville?

9   **A**     I would say he has a lot more than most in a lot of

10  respects, because he tries to do a lot for the children.

11  And business-wise, he does a lot to -- I don't have to worry

12  when I take something if I'm going to get paid or have to

13  wait six months.  He's always been a good businessman to my

14  company.  He's always been very pleasant to deal with and

15  always been very well to my company.

16  **Q**     You'd say a preferred customer?

17  **A**     Yes.

18       MR. REID:  Thank you, Mr. Ison.

19                  CROSS-EXAMINATION

20  BY MR. BINGHAM:

21  **Q**     Mr. Ison, have you had an opportunity to know his

22  wife, Mrs. Crystal?

23  **A**     I have met her some, yes.  Not -- I don't know her as

24  much as I do Deivin, but I have met her some.

25  **Q**     Well, in your opinion enough to form an opinion as to

1  her character?

2  **A**    Well, her character towards children and all the kids

3  around the community there, I saw it's been great as a

4  mother and as a lady in the community.  That's --

5          MR. BINGHAM:  Thank you very much.  No further

6  questions, Your Honor.

7          MR. PENFIELD:  Briefly, Your Honor.

8                        CROSS-EXAMINATION

9  BY MR. PENFIELD:

10  **Q**    Mr. Ison, do you know anything about Grand Family

11  Enterprises?

12  **A**    Anything about what?

13  **Q**    Grand Family Enterprises.

14  **A**    No, sir.

15  **Q**    Okay.

16  **A**    I just know that, if you're asking, you may be asking

17  something -- I do know something about this.  If it's

18  Deivin, the gentleman that worked for him, I met a lot of

19  the gentlemen that worked for him.

20  **Q**    It's the business that the Escalantes had where they

21  transported people to and from the poultry plant.

22  **A**    I never seen them transport anybody.  I have seen a

23  lot of guys on the soccer field and stuff that was already

24  there.  I never seen nobody transport nobody.

25  **Q**    That's fair.  Would you be surprised to know that

1  their businesses have more than four hundred thousand

2  dollars in them, their business account?

3  **A**      No.  I wouldn't be surprised at all because --

4  **Q**      But you're not familiar with Grand Family

5  Enterprises?

6  **A**      No, no.

7           MR. PENFIELD:  That's all I have.  Thank you, sir.

8           THE COURT:  Anything further of this witness?

9           MR. REID:  Redirect, Your Honor.

10                  REDIRECT EXAMINATION

11  BY MR. REID:

12  **Q**      Mr. Ison, when did you start work on the soccer

13  fields?

14  **A**      I can't really tell you.  It's been a long time back.

15  **Q**      More than three years ago?

16  **A**      Yes.  It's been -- he started it over three years

17  ago.  But I have only had the concrete plant for three

18  years, so I met him three years ago is when I met him.

19           MR. REID:  Thank you.  That's all.

20           THE COURT:  Thank you, Mr. Ison.  You can step

21  down.

22           MR. REID:  Your Honor, we call Andrew Escalante.

23                  ANDREW ESCALANTE, SWORN

24           THE CLERK:  State your name for the record.

25           THE WITNESS:  My name is Andrew Christopher

1   Escalante.

2                     DIRECT EXAMINATION

3   BY MR. REID:

4   **Q**      Andrew, where do you live?

5   **A**      Do you want the direction, address, or --

6   **Q**      Just the town.

7   **A**      Haleyville.

8   **Q**      Okay.  Do you recognize the gentleman sitting at the

9   end of the table?

10  **A**      Yes, sir.

11  **Q**      Who is that?

12  **A**      He is my father who originally took me in from my

13  other father.  He is the guy that I respect most because he

14  raised me.  He took me in after my first father had, what I

15  would believe was rudely treated my mom.  He -- I don't know

16  the exact story.  I was little at the time.  I wouldn't be

17  able to describe the age.  From my knowledge, he did put me

18  up for adoption but this kind gentleman that sits in the

19  corner over there took me in and my mother and he raised us

20  as a father.  So yes, I would call him my father.

21  **Q**      He is your adopted father?

22  **A**      Yes, sir.

23  **Q**      And is he a hard working man?

24  **A**      He is.

25  **Q**      And do y'all have strong ties to the community there

1   in Haleyville?

2   **A**     I would say so, yes.

3   **Q**     And do you believe your father to be a man of his

4   word?

5   **A**     I do, I do.  He has taught me over the years.

6   **Q**     If he says he's going to be somewhere, is he going to

7   be there?

8   **A**     He will.

9   **Q**     If he makes an obligation, he will keep it?

10  **A**     He will.

11          MR. REID:  Thank you.

12                      CROSS-EXAMINATION

13  BY MR. BINGHAM:

14  **Q**     How would you describe your mother?

15  **A**     Kind hearted, sweet, gentle, I don't know.  All the

16  kind words in the world.  She means a lot to me.  So does my

17  father.

18  **Q**     Do you understand that you mean a lot to her?

19  **A**     I do.

20  **Q**     Has she ever given you any reason to doubt her

21  honesty?

22  **A**     No, sir.

23  **Q**     Has she always been where she said she would be when

24  she said she would be there?

25  **A**     Yes, sir.

1  **Q**     Has she supported you in your academic and sporting

2  activities?

3  **A**     Yes, sir.

4  **Q**     You're a soccer player; is that correct?

5  **A**     I played soccer in my younger years, yes, sir.

6  **Q**     And what grade are you in now?

7  **A**     I am currently enrolled in eleventh grade.

8  **Q**     Are you planning on graduating?

9  **A**     Yes, sir.

10  **Q**     Is it your sense of things that because of you -- and

11  I believe you have three brothers and sisters?

12  **A**     Yes, sir.

13  **Q**     That your mom will stay right there with you guys in

14  Haleyville?

15  **A**     She will.

16       MR. BINGHAM:  No further questions, Andrew.  Thank

17  you.

18       MR. PENFIELD:  Nothing, Your Honor.  Thank you.

19       THE COURT:  Thank you, Mr. Escalante.  Why don't

20  we just take a few minutes convenient break for the court

21  reporter's benefit.  So stretch for five minutes.  But I do

22  want to conclude the hearing today.

23       (Break taken.)

24       (Open court.)

25       THE COURT:  All right.  Are there any other

1  witnesses?

2          MR. REID:  Your Honor, Mr. Escalante would rest at

3  this time.

4          MR. BINGHAM:  Your Honor, Mrs. Escalante rests.

5          THE COURT:  Thank you.  I would like to hear

6  argument.  And I think let's break it out separately into

7  the preliminary hearing and the detention portions.

8          I will hear first from the government since you

9  have the burden as to why there is probable cause here.

10          MR. PENFIELD:  Judge, I think it's set out in the

11  affidavit with which the Court is familiar and that is why I

12  was trying to move somewhat expeditiously.

13          It is clearly established in the affidavit that

14  both Mrs. Escalante and Mr. Escalante were involved in the

15  Grand Family Enterprises business, originally started as

16  Crystal Escalante and then later merged into Grand Family,

17  that there were numerous, numerous vehicle stops with

18  numerous of their employees who were being driven to and

19  from the poultry plant.  That is transportation under

20  1324(a)(1)(A)(ii) and we also have conspiracy under (B)(1)

21  and (2).

22          I think the affidavit clearly sets forth that

23  these were their employees, that they provided

24  transportation to them, they were checking on them, that

25  there were instances when they were provided documents that

1   they were aware that they were not legal.  In fact, under

2   the standard, reckless disregard is sufficient, but I think

3   there's more than enough evidence to establish that they're

4   guilty of what they've been charged -- I mean, there's

5   probable cause to believe that they're guilty of what is set

6   forth in the complaint.

7           If Your Honor wants me to move to detention --

8           THE COURT:  I would rather wait and hear any

9   response related to the preliminary hearing.

10          MR. PENFIELD:  Yes, sir.

11          MR. BINGHAM:  May I approach?  (Indicating) this

12   is case law that I will be citing from.

13          I don't disagree with the assessment by the

14   government's attorney with respect to the affidavit with the

15   exception of documents, and I believe the testimony in

16   response to one of Mr. Reid's questions varied from that.

17          Taking that affidavit in the light most favorable

18   to the prosecutor, however, let's take a look at the law, in

19   particular the law which they've been charged under, which

20   is 1324(a)(1) primarily double (ii), double small ii.  That

21   section has been the subject of some pretty interesting

22   criminal litigation, and I have brought some of those cases

23   here today.

24          And it starts, this is not a section often used,

25   but it starts with the case of United States versus Gustavo

Dominguez, it's an Eleventh Circuit case, and it came on appeal from a denial of a directed verdict.

And the result in that case, it stands on a line of cases before from several different jurisdictions interpreting the meaning of the statute.

In the Dominguez case, a sports agent had people smuggled into the country and then he transported those people.  And the question before the Court was whether that transportation inside of the United States was in violation of 1324(ii).

And the long and short of it was it was not and the evidence was insufficient because of the final words in the statute which state, in furtherance of such violation of law.  That refers, in turn, to an alien who remains in the United States in violation of the law.

Flipping to the case that interprets that is the next case presented for Your Honor's review which is Moreno-Duque and it is a Vermont district case, but the importance of Moreno-Duque was the survey they did of the various circuits who had interpreted the meaning of the statute. And what that case tells us is that, one, as the Court knows, this statute has to be strictly construed.  And so Moreno-Duque follows the line of cases that strictly construe that statute.  And, in the instant case, an employer's transportation of illegal aliens to a place of

employment for the purpose of employment is not a violation
of the statute.  And that is because in the Duque final
analysis they point out that there are two separate things
going on with regard to the statute.

The government asserts that, not that people were
smuggled in, aliens, but they remained here illegally and
Mrs. Crystal, through her contact, had to know that.

What Duque points out is that if you transport
people simply because you know they remain here illegally,
you are not violating the statute, if you're transporting
them for some reason other than to aid in domestic
smuggling.

So, for example, if they were transporting aliens
they knew to be unlawful for the purposes of concealment,
that would be an issue, to get them to another location,
what the Ninth Circuit calls a chain of smuggling, outside
and inside the United States.

Flipping back to the Eleventh Circuit.  What the
Eleventh Circuit said with respect to transportation
domestically of those who may remain unlawfully in the
United States, the evidence did not establish that the
defendant knowingly concealed, harbored, or shielded the
detection of five Cuban baseball players.

So, Duque is pointing out, to get to the
difference between purpose and effect, none of the Court's

1    analysis denies the fact that if you know somebody is an
2    alien that is out of status or illegal and you help them in
3    some form or fashion, that it could have the effect, the
4    effect of maintaining those people illegally here in the
5    United States.  But that's not the analysis of the statute.
6         The analysis of the statute has to be what your
7    purpose is.  And if your purpose is smuggling or assistance
8    in smuggling, the statute applies.  Otherwise, as the
9    Eleventh Circuit has said, it is inapplicable.
10        The third case that we present for review is a
11   case called United States versus Merkt.  Now, it's a Fifth
12   Circuit case out of the eighties, but that is when we were
13   in the Fifth Circuit, and Dominguez relied in large part on
14   Merkt.
15        Here's what the Merkt court said, the Fifth
16   Circuit, and again, they are defining that last phrase after
17   the comma referring back to the alien's intent under
18   violation of law.
19        The Court stated, the willful transportation of
20   illegal aliens is not, per se, a violation of 1324.  For the
21   law proscribes such conduct only when it is in furtherance
22   of the alien's unlawful presence.
23        In other words, Merkt held that this meant there
24   had to be a factual finding of specific intent -- again,
25   purpose, specific purpose.

1          Those are the three largest cases.  And then we

2     have some forfeiture cases, some civil cases, that again

3     analyze purpose versus effect in terms of fact situations

4     very similar to ours.  For example, the U.S. versus One 1985

5     Ford which talks about the transportation of employees by

6     either a foreman or owners of a company.  And again, the

7     analysis remains the same.

8          The Eleventh Circuit, I think, is a good case

9     because it went a step further, perhaps more conservative,

10    but nevertheless, and they looked at the evidence on this

11    appeal from the denial of the directed verdict and they

12    understood that the facts of concealment, the facts of

13    surreptitious movement, the fact of trying to hide something

14    could, in a jury's mind, speak to enough evidence to find a

15    defendant guilty.

16         But absent those facts of concealment or

17    surreptitious movement, there was nothing to tie a factual

18    basis to a case where a person is simply moving somebody

19    domestically in the United States, and their purpose is

20    other than smuggling or aiding.  Smuggling, again, what the

21    Merkt court called specific intent.

22         THE COURT:  I have a question about what you just

23    mentioned.  I'm looking at the Duque case that you provided

24    me, and we're talking about the purpose for which they're

25    transported.

1    Duque appears to allow that that purpose could be

2    proven by evidence if efforts to conceal the unlawful

3    presence of the individuals or efforts to avoid detection by

4    law enforcement authorities.  Are you contending that there

5    is no evidence in this case before me of either efforts to

6    conceal their presence or efforts to avoid detection?

7    MR. BINGHAM:  I am contending the same.  And I

8    think my questions that -- to Investigator Rogers all went

9    to that and he was negative across the board on that.  That

10   he was looking -- and I don't want to misstate him, but my

11   sense of his responses were that this was in fact an

12   investigation into unauthorized employment.  Why they

13   charged under transportation, I do not know.

14   But the specific intent, I think, was clear from

15   the affidavit that the specific intent of these parties was

16   to get them to employment, not to assist or aid in the chain

17   of smuggling.

18   For that reason, it comes back to Your Honor's

19   question, there was no testimony that was elicited that

20   there was any attempt to conceal or harbor.  And that was

21   revealed in the question I asked Officer Rogers about

22   Mrs. Crystal pulling up in her 4Runner when she saw the

23   agents with one of the vans pulled over.  If there's ever a

24   statement that is more honest than that, these people work

25   for me, what are you doing, of her own volition.

1          Your Honor, those are the -- that's an overview.

2     And Duque, the Duque case on Pages 3 through 6 provides a

3     thumbnail overview of the last cases I cited, Merkt and U.S.

4     Versus v. One 1985 Ford.

5          I have not, in my research, found anything that

6     countermands that on several fronts.  The key in the

7     statutory interpretation, according to the courts that have

8     looked at this, is really everything after that last comma

9     which says in furtherance of such violation, and that

10    violation refers to the initial violation of the alien that

11    crossed the border.

12          Additionally, and lastly, I need to mention this

13    for the Court.  We look at the legislative and the

14    congressional record, and again, as the Court might expect,

15    that record is, under this section of the immigration code,

16    is all anti-smuggling provisions.  And that's pretty clear

17    when you go beyond little double (ii) and look at the other

18    four sections of 1324(a).  And it's worth pointing out that

19    they have also been charged under the aiding and abetting

20    part of that statute which is small Roman Numeral B as well

21    as a conspiracy part of that statute which is small Roman

22    Numeral B (II).  And that statute or that part of the

23    statute says if any of the preceding four paragraphs are

24    violated, not only the transportation paragraph, but any of

25    the other four -- and none of those four paragraphs go to

employment, one is about actually bringing or attempting to

bring somebody into the United States.  Two is the

transportation statute we have been talking about today.

Three is concealing, harboring or shielding from detection

or an attempt to conceal, and that could take place in a

means of transportation.  I think the testimony is that is

not the case today.  And four is encouraging or inducing an

alien to come into the United States or residing in the

United States in reckless disregard to the fact that such

would be in violation of law.  So that would refer to a

person that you were trying to induce to come into the

United States from outside the United States.

Therefore, thank you, Your Honor, I know it's late

in the day.  But in our humble opinion the government is way

off point on this one.  There's been no showing of specific

intent.  And because the factual allegations don't meet the

elements of the case, we respectfully ask the Court to make

a finding of, as we sit here today, no probable cause.

Thank you, sir.

THE COURT:  Thank you.  Mr. Reid, anything you

would like to add?

MR. REID:  Very briefly, Your Honor.  Agent Rogers

testified about how little he witnessed Mr. Deivin

Escalante.  He said that he never saw him in a van, he was

part of a business, he's a registered part of the business.

1   But there also was testimony about other managers and

2   operatives within the chain of command of that business.

3        You also heard testimony from other individuals

4   about other business interests that the Escalantes had prior

5   to GFE coming into existence.  And I think the government

6   has offered testimony about all this money that's in their

7   bank account, but there's been no direct evidence showing

8   that any of this money came directly from that operation.

9        So, the source of that money has not been proven

10  and, therefore, I think, Your Honor, along with all the

11  arguments that Mr. Bingham has put forth, that we ask you to

12  find no probable cause in the preliminary hearing aspect of

13  this case.

14       THE COURT:  Thank you.  I appreciate the

15  arguments.

16       I do find there is probable cause for these

17  charges to go forward.  First, there is sufficient evidence

18  of Mr. Escalante's involvement in GFE.  And then the only

19  real question as to the probable cause for these offenses is

20  that intent element.

21       As I was probing with Mr. Bingham, I did think

22  there's evidence here from which I can conclude that there's

23  probable cause to believe that there were efforts to conceal

24  these individuals unlawful presence in the United States and

25  to conceal this operation from law enforcement.  While there

1  may have been specific interactions involving either Mr. or

2  Mrs. Escalante in which they were very forthcoming, there's

3  also testimony before me that's more than enough for me to

4  find that that intent is there.

5         To me, probably the two most meaningful pieces of

6  evidence there are the information from the confidential

7  source indicating that working with GFE would not require

8  any type of paperwork; and then the testimony that we heard

9  today that there were individuals found to be working for

10  GFE after they had been noted as terminated within the

11  E-Verify system.

12         From both of those pieces of evidence and from

13  other evidence in the complaint, I conclude that these

14  charges will go forward.

15         So now we can take up the question of detention.

16  I'll hear from the government since it is your burden as to

17  why either Mr. or Mrs. Escalante should be in custody.

18         MR. PENFIELD:  Thank you, Your Honor.  I think --

19  and the government has reviewed the pretrial services report

20  which I know Your Honor has as well.

21         With regard to Mrs. Escalante, we certainly think

22  that all of those conditions are appropriate.  I think to

23  put it simply, Judge, there is so much money involved here.

24  And I know the Court heard testimony about it, has reviewed

25  the pretrial services report.  The agent's testified that we

1  seized four hundred thousand dollars, five hundred thousand

2  dollars worth of vehicles.  If Mrs. Escalante is appropriate

3  for a bond, and I can certainly see the defense argument,

4  and I don't know if the Court is thinking about it this way,

5  well, you have got a whole lot of their money --

6         THE COURT:  That is what I was thinking.

7         MR. PENFIELD:  Well, what we have is their dirty

8  money.  So, this is an odd phrase to use, but where is the

9  skin in the game.  We have already taken their dirty money

10 and they know we have taken their dirty money.  Is there

11 some other asset that Mrs. Escalante, and when we reach

12 Mr. Escalante, that they want to put up, perhaps some other

13 family members' house, that would just satisfy the Court

14 that, no, they really have a reason to not just say they got

15 all our dirty money and we're out of here.

16        I guess that's kind of ultimately the government's

17 position with regard to her.

18        Mr. Escalante is a more difficult case because of

19 his immigration status.  I appreciate that he's been here

20 for a long time and has lots of friends in Haleyville.

21        The danger with him is his passport is Guatemala.

22 And so what is his reason to not say, you know, we had a

23 great ride, and they got our money, and I'm going back

24 somewhere.

25        So I think with both of them, I think it's fair to

1   say there needs to be some more security other than just

2   saying you have all our proceeds.  What other security can

3   they put up.  And I think that is ultimately the

4   government's position.

5          THE COURT:  Are you not seeking detention for

6   Mr. Escalante?

7          MR. PENFIELD:  I am, Your Honor.  But I think with

8   regard to her -- I mean, if Your Honor leans towards a bond

9   on Mr. Escalante, we -- I do know that counsel, because I

10  asked them to, has brought their passports.  So we have

11  that.

12          I think that Mrs. Escalante should probably post,

13  a reasonable number would be perhaps a hundred thousand

14  dollars, if it turns out that their house in Haleyville is,

15  you know, ninety-two as opposed to one hundred, that's fine.

16  I think they have got to satisfy the Court.

17          For Mr. Escalante, our position is detention.  But

18  if he's going to be released, I think an additional secured

19  bond of, I would say probably two hundred thousand dollars

20  would be reasonable for him.

21          THE COURT:  Either of you like to respond?

22          MR. REID:  I will, Your Honor.

23          THE COURT:  Go ahead.

24          MR. REID:  I will answer the question for the

25  Court, where is Mr. Escalante's skin in the game.  Sitting

1   all the way across that second row right back there.  That's

2   his skin in the game.

3          And I take it as an affront to say he doesn't have

4   any.  That's his skin in the game.  His children.

5          Your Honor, this man came to this country when he

6   was four years old.  He's been a resident or resided in this

7   country, brought here by his mother, who is here as well,

8   when he was four years old.  You heard the testimony of

9   individuals, respected individuals in the Winston County,

10  Haleyville community.  They talk about this man (indicating)

11  and what his position is in the community.

12         Where is his skin in the game?  His skin is right

13  here in Alabama.

14         Now, as I understand the law, Your Honor, there --

15  bond comes down to two issues:  Danger to the community and

16  risk of flight.  Here's his passport.  We surrender it

17  (indicating).  He'll wear an ankle monitor.  They have got

18  all of his money, clean and dirty, whatever alleged dirty

19  money.  He can't go anywhere.  He doesn't want to go

20  anywhere, Your Honor.  He's here.  He's more American -- his

21  nationality at birth is Guatemalan, but he's as much an

22  American as I am.  Because of his ties to the community, his

23  children is here, his business is here, his life is here.

24         Your Honor, I think there can be reasonable

25  conditions imposed to assure that he's going to appear at

1    each and every proceeding that this Court or any future

2    Court will order.  He is here.  His family is here.  His

3    life is here.  And there's been no testimony from anyone,

4    other than prosecutorial speculation that says we've had a

5    good run, we're going to pull up our stakes and go back to

6    Guatemala.  Zero.  None.

7         We've produced witnesses and we had more, but in

8    the interest of judicial economy and time, we didn't call

9    everyone we could have called, but we could have lined this

10   courtroom, Your Honor, with people from his community that

11   are close to him, that are close to his family, that know

12   him and that have known him for years prior to GFE, when he

13   ran a cafe and a grocery store in Haleyville.  He has ties

14   to the community.

15        I would ask you to give him a reasonable bond.  If

16   the Court so desires that it be secured, we have no problem

17   with that, and we'll make every effort to do that.  We think

18   two hundred thousand dollars is totally unreasonable.

19        Because what it does, Your Honor, is it puts this

20   man in custody during the pendency of this action.  And you

21   heard some testimony about this action.  This is an

22   administrative type case where his assistance and his

23   participation in his defense is vital to look at employment

24   records, to look at people who have worked, to look at all

25   those things.  And if he's held in custody in Pickens

County, it severely disadvantages his ability to defend
himself.

So, for all those reasons, Your Honor, I would
like to ask the Court to consider a bond with the least
restrictive reasonable circumstances given all the testimony
because he's going to appear.  When it's time for court,
Deivin Escalante will be here sitting with counsel that is
privileged to represent him in this matter.

Thank you, Your Honor.

THE COURT:  All right.  I'm not one to
unnecessarily beat around the bush.  I think there are
appropriate conditions for both of you.  I have not decided
yet on what they are.  But neither of you are going to be
detained pending trial.

I don't find the government has carried its burden
of proving that there are no conditions that will reasonably
assure Mr. and Mrs. Escalante's presence at trial and you
have not made any argument about danger.  Specifically as to
Mr. Escalante, since he's the one that most of the testimony
was focused on today, I find that it's very meaningful that
he has literally no criminal history; that he has very deep
ties to this country and to the Haleyville community,
including the family who is sitting behind him, and I
appreciate all of you being here.  Any concerns I have about
him being a flight risk, any meaningful concerns are ensured

1    by taking his passport and by crafting other conditions that

2    are appropriate.

3            The only real concern I had coming into this

4    hearing was with the discrepancy apparent between what was

5    disclosed from an asset standpoint by Mr. and

6    Mrs. Escalante, but I have not heard anything meaningful

7    from the government resolving what assets are there, any

8    specific information about anything that was withheld or not

9    disclosed appropriately.  I expected to hear more specific

10   information about all of that today.

11           As I said, there are appropriate conditions for

12   both of their release.  I do think that it could be

13   appropriate here to have some type of security.  And I do

14   think that the conditions that probation has proposed for

15   Mrs. Escalante are appropriate and they are also appropriate

16   generally for Mr. Escalante.

17           I will ask this question, though, the proposal is

18   that they be placed on some type of restriction as to their

19   travel, not travel outside of the district, but travel to

20   and from the home.  I am inclined to impose a curfew on both

21   of them, although that depends in part on what they intend

22   to do between now and trial and whether we need to provide

23   for the ability to find alternative employment.  That may be

24   further ahead of where you are with either of them.

25           Do either of them know what they would intend to

1  do if they are allowed out on bond from an employment

2  standpoint?

3    MR. BINGHAM:  From an employment standpoint, no,

4  Your Honor, but we'll find out.

5    MR. REID:  Your Honor, I have not had that

6  conversation with Mr. Escalante, but I would suppose that he

7  would continue to do what he has done for his entire

8  lifetime, cut grass or do odd jobs, to find work around to

9  support his family.

10    THE COURT:  We're going to say an 8:00 to 8:00

11  curfew initially.  But if that becomes problematic, then

12  we'll revisit it.

13    I think that leaves only the question of whether

14  and to what extent there would be a surety for these bonds,

15  which I do find to be a meaningful further deterrent from

16  absconding from justice, although as we have already

17  discussed, I think there are much greater motivation for

18  both of them to stay here.

19    Do either of you have any proposal as to

20  appropriate assets that could be put up?

21    MR. BINGHAM:  Your Honor, the home place has not

22  been seized.  And I understand the value is approximately

23  sixty thousand, seventy thousand dollars.  So we would ask

24  for secure bonds for Mrs. Escalante for one half of that --

25  thirty, thirty-five thousand dollars.

1       THE COURT:  You would like the other half?

2       MR. REID:  Yes, sir.

3       THE COURT:  What is the government's position on

4    that?

5       MR. PENFIELD:  Judge, speaking to my agent, I

6    think that that home, and I have told my colleagues because

7    I wanted them to be clear, it's potentially in jeopardy as

8    we go through these proceedings, but it hasn't been seized

9    at this point.  I think it's probably worth more like sixty-

10   five or seventy thousand dollars based upon what I have

11   heard from the agent.

12      THE COURT:  I am trying to think of how to craft a

13   condition.  I don't suppose that we could penalize either of

14   them if the other were to violate bond, so there is not any

15   way to have effectively joint and several liability relating

16   to that home --

17      MR. PENFIELD:  My understanding, Your Honor, I

18   didn't mean to interrupt the Court.  I have been working

19   with counsel all afternoon, as I know the Court has known,

20   and I appreciate the Court's patience in this hearing, is

21   that they have looked at some other potential properties.

22      MR. REID:  If I may.  They own a property here in

23   Jefferson County that they have spent some weekends in.  It

24   probably does not rise to the value of their Haleyville

25   home, but they would be -- Mr. Escalante would be willing to

1  pledge that residence for his bond here in Jefferson County.

2        THE COURT:  It is less valuable than the

3  Haleyville home?

4        MR. REID:  I would say probably about forty

5  thousand dollars, Your Honor, that's just an off-the-cuff

6  estimate.

7        THE COURT:  All right.

8        MR. REID:  Or interchangeable, however the Court

9  would see fit to do it.  It would work for Mrs. Escalante as

10  well.

11        THE COURT:  That's where I was going.  Unless

12  either of you has something further, another proposal, then

13  what I'm going to do is Mrs. Escalante's bond will be

14  secured by the Jefferson County property and Mr. Escalante's

15  bond will be secured by the Haleyville residence.

16        And we'll have to give Mrs. Langley a few minutes

17  to draw up those conditions.

18        Is there anything else that we need to take up

19  other than getting the paperwork prepared?

20        MR. BINGHAM:  No, Your Honor.

21        MR. PENFIELD:  No, Your Honor.

22        MR. REID:  No, Your Honor.

23        MR. PENFIELD:  Probation is whispering in my ear.

24  I appreciate that counsel has brought their passports.  I do

25  note that Mr. Escalante's Guatemalan passport is brand new,

1   so I don't know if he has another one.  But I think it's

2   appropriate that both be ordered to surrender any travel

3   documents to either probation or to probation, I guess, I

4   think that needs to be a condition.

5           THE COURT:  That's appropriate.  And I think it's

6   already drafted in a way that would cover that.

7           MR. REID:  I can address Mr. Escalante's passport.

8   He was issued a new passport by the Guatemalan consulate in

9   Florida and they took his old one when they issued him the

10  new one.  So he does not have in his possession the old one.

11          THE COURT:  Thank you.

12          (Brief pause)

13          THE COURT:  What we're going to do, since I'm

14  placing both you on very similar bonds, I want you both to

15  follow along as I go through all these conditions and make

16  sure there is not any question about what it is that's

17  required of you.

18          As to Mrs. Escalante, I'm placing you on a secured

19  bond in the amount of forty thousand dollars, which is

20  secured against the Jefferson County property.  Just so

21  there is no confusion, if you could identify the address of

22  that property for the record right now.

23          MR. BINGHAM:  She doesn't know the address.

24          MRS. ESCALANTE:  4203 39th Avenue North.

25          THE COURT:  4203 39th Avenue North in Birmingham.

1    MRS. ESCALANTE:  Yes, sir.

2    THE COURT:  And then as to Mr. Escalante, I'm

3    placing you on sixty thousand dollar secured bond, secured

4    against your personal residence in Haleyville.  What is the

5    address for that residence?

6    MR. ESCALANTE:  It's 2530 7th Avenue in

7    Haleyville, Alabama.

8    THE COURT:  If you'll each turn to the next page

9    of your bond.  You'll see I'm placing you on all the

10   standard conditions of release here in the Northern District

11   of Alabama.  Those are, first, you not commit any new

12   offense while you're on bond; second, that you maintain your

13   current residence and advise your supervising officer before

14   making any change in address or phone number; third, that

15   you appear at all proceedings as required in this case.  And

16   if convicted, that you surrender for service of any sentence

17   that's imposed; fourth, you must report to your supervising

18   officer as instructed and answer all questions truthfully.

19   You also must allow your PO to visit you at any time at your

20   home or elsewhere; fifth, you must not contact, intimidate,

21   or threaten any witness, victim, juror, informant, criminal

22   investigator or officer of the court.  I will note, of

23   course, that the two of you being married are not prohibited

24   from contacting each other.  I do expect you not to

25   intimidate or threaten each other during the pendency of

1    your bond; six, that if you're to have any contact with law

2    enforcement, you must report that immediately to your

3    probation officer; seven, you must cooperate in the

4    collection of DNA sample; eight, you're prohibited from

5    owning, possessing, or having access to any firearm,

6    ammunition, dangerous weapon or destructive device and you

7    consent to the marshals and probation to search your person,

8    car, or home at any time for weapons.  I will note that

9    there were weapons in the home at some point.  I expect them

10   to be out by the time they get home; nine, you must not use,

11   possess, or be around any illegal controlled substances.

12   You will be required to submit to testing if it's determined

13   that that's appropriate by the probation office.

14         Moving then to the special conditions of release.

15   Each of you are going to be subject to condition eleven

16   which requires electronic monitoring.  I understand, because

17   of the logistics, that you will be returning to your

18   respective detention facilities tonight but you'll be

19   brought back here in the morning to hook up your electronic

20   monitoring program or equipment.

21         You also both are subject to condition number

22   twelve which puts you on curfew, as we have already

23   addressed, and be home at night from 8:00 to 8:00 and that

24   may be modified by the probation officer.  Special condition

25   thirteen is going to restrict you to travel in the Northern

1    District of Alabama.  And fourteen requires you to surrender

2    your passport and not to obtain any other new passport or

3    international travel document.

4         I will note for the record that the current

5    passports were surrendered by both Mr. and Mrs. Escalante to

6    probation earlier this evening.

7         Moving to the next page, you are placed on special

8    condition eighteen which prohibits the excessive use of

9    alcohol while on bond.

10        Special condition twenty-two which prohibits you

11   from obtaining new lines of credit without permission.

12        And special conditional twenty-three which

13   requires you to provide the supporting documentation related

14   to the properties that are securing your bonds no later than

15   the close of business on Thursday the 29th.

16        So, where did Mr. Penfield go?  I didn't notice

17   that he was not in here for that.  I'm not sure it's

18   critical.

19        Are there any objections by the defense as to

20   those proposed conditions?

21        MR. REID:  None from Mr. Escalante, Your Honor.

22        MR. BINGHAM:  None for Mrs. Escalante, Your Honor.

23        THE COURT:  Mr. Penfield, I merely wanted to know

24   whether, and I understand that you object possibly to the

25   fact of either of them being on a bond, but as to the

1   conditions that we have addressed earlier and proposed, do

2   you have any objection to those specific conditions?

3           MR. PENFIELD:  I do not.

4           THE COURT:  All right.  Thank you.  So, for both

5   of you, I want to make sure you understand exactly what is

6   going on here.  Do you have any questions about your bond

7   conditions, Mrs. Escalante?

8           MRS. ESCALANTE:  No, sir.

9           THE COURT:  How about you, Mr. Escalante?

10          MR. ESCALANTE:  No, sir.

11          THE COURT:  You both understand that if you

12   violate your conditions that I could revoke your bond

13   meaning that you would have to come back into custody

14   pending trial, do you get that?

15          MRS. ESCALANTE:  Yes, sir.

16          MR. ESCALANTE:  Yes, sir.

17          THE COURT:  You also understand if you do not show

18   up for trial or for any other hearing where your presence is

19   required in this case that you could have a warrant out for

20   your arrest and you could be facing additional criminal

21   charges for not showing up?

22          MR. ESCALANTE:  Yes, yes.

23          MRS. ESCALANTE:  Yes, sir.

24          THE COURT:  Okay.  All right.  So, as I mentioned,

25   you'll have to be processed out at your facility, so they

1    will bring you back in street clothes tomorrow and hook you

2    up with electronic monitoring and you'll be free to go from

3    there.  You can go ahead and execute that paperwork now.

4              Anything else we can take up today?

5              MR. PENFIELD:  No, Your Honor.  Thank you very

6    much.

7              MR. REID:  When we secure the documents related to

8    both the individual properties, should we electronically

9    file those or turn a hard paper in to the clerk?

10             THE COURT:  Mrs. Langley, do you have a preference

11   on that?

12             THE CLERK:  I didn't hear.

13             THE COURT:  The question was, when the documents

14   are returned, should they be electronically filed or hard

15   filed into the clerk's office?

16             THE CLERK:  Bring them to me.

17             THE COURT:  I trust her more than CM/ECF.  Thank

18   you for your patience.  We're adjourned.

19                        (COURT ADJOURNED)

20

21

22

23

24

25

C E R T I F I C A T E

    I hereby certify that the foregoing is a correct transcript from the record of the proceedings in the above-referenced matter.


_____

Teresa Roberson, RPR, RMR